Mr. Justice MILLER
delivered the opinion of the court, and after stating principal facts, proceeded as follows:
The only question submitted to the jury on the second trial, the record of which is now before us, was whether the Mary W., the vessel in which the loss occurred, did or did not rate below A 2, within the meaning of the policy. Some of the instructions prayed by the defendants, and refused by the court, proposed to submit to them another question. Having given testimony which tended to establish a usage, that the premium named in the policy was in all eases a mere nominal one, and that the insurer had a right, when the risk was reported, to vary the rate of premium as he might wish, they asked the court to instruct the jury that if such a usage were proved, then the defendants had the right to demand, as they had done, an increased rate, which plaintiff had refused to give, without any regard to the rating of the vessel above or below A 2; and that plaintiff could not recover. This is the substance of the seventh and eighth instructions prayed by defendants.
Their ninth prayer, assumed that such was the construction of the policy, without any aid from usage to assist in its interpretation.
We do not think’ that the policy on its face can be so construed. It is signed by the defendant, and not by the plaintiff. All its promises are made by the defendant in its own language. All its exceptions and reservations are those of defendant. The rule is that when in such cases the language requires construction, it shall be taken most strongly against the party making the instrument.
The various phrases which relate to this matter of premium, are scattered through the policy “ in most admired disorder.” They may be brought together and stated thus: The plaintiff is insured on one-fourth of five thousand bags of coffee, from Rio de Janeiro to a port or ports of the United *469 States. The consideration of the insurance is acknowledged to be paid at the rate of 1|- per cent.; an additional premium if shipped by vessels lower than A 2, or by foreign vessels; a return of J per cent., if shipped direct to an Atlantic port; the premium on risks to be fixed at the time of indorsement, and such clauses to apply as the company may insert, as the risks are successively reported. As it was not known that the coffee had been shipped, or on what vessels it had been or might be shipped, they were to be reported as soon as the owner received advices. Then the premium on the risks was to be fixed. But by whom and by what rule ? The policy, we think, answers this, except in the ease of a foreign vessel, or one rating below A 2. In either of these cases the premium was to be increased. If the shipment was direct to an Atlantic port, J of 1 per cent, was to be deducted. But if the vessel was not a foreign vessel, nor one that rated below A 2, nor the shipment direct to an Atlantic port, then the premium was already fixed, and the money paid, and nothing more remained to be done in that respect.
This provision, that the premium shall be fixed at the time of the indorsement of the risk on the policy, has its full use and function in the three contingencies above-mentioned, wherein it is expressly stipulated that the rate shall differ from one and one-half per cent. The very fact that these three contingencies are expressly named, in which a different rate of premium may or shall be charged, excludes the idea that one of the parties may vary the rule in all cases, or in any other case.
Much weight is attached in the argument in this connection, to the phrase “ such clauses to apply as the company may insert, as the risks are successively reported.” It is not necessary to determine here what is the character of the clauses referred to, or what effect that phrase might have under certain circumstances. A war, a blockade, or some other change of affairs occurring after the policy was signed, might justify the company in inserting some clause for its protection, but we do not think it can be so construed as to authorize a clause changing the rate of premium in a case *470 where it is fixed by the other terms of the contract. No ■ such clause was added, or proposed to be added to the policy by the company, and it is useless to speculate on what might or might not-have been successfully claimed, in a case where no claim was made.
We have thus shown that the instrument has a well-defined meaning in reference to the rate of premium, and that it does not justify the ninth instruction asked by the defendants.
When we have satisfied ourselves that the policy is susceptible of a reasonable construction on its face, without the necessity of resorting to extrinsic aid, we have at the same time established that usage or custom cannot be resorted to for that purpose. In speaking of usages of trade, Greenleaf says :* “ Their true office is to interpret the otherwise indeterminate intentions of parties, and to ascertain the nature of their contracts, arising not from express stipulation, but from mere implications and presumptions, and acts of doubtful and equivocal character, and to fix and explain the meaning of words and expressions of doubtful and various senses.” Again, he says,† “ But though usage may be admissible to explain what is doubtful, it is not admissible to contradict what is plain.” In the case of the Schooner Beeside,‡ Mr. Justice Story, after using language strongly condemning the tendency to introduce and rely on usages in courts of justice, and defining'their true office in the language just cited from Greenleaf, proceeds to say: “ But I apprehend that it can never be proper to resort to any usage or- custom to control or vary the positive stipulations in a written contract, and, a fortiori, not in order to contradict them. An express contract of the parties is always admissible to supersede, or vary,' or control a usage or custom; for the latter may always be waived at the will of the parties. But a written and express contract cannot be controlled or varied or contradicted by a usage or custom, for that would not only be to admit parol evidence to control, vary, or contradict written contracts, *471 but it would be to allow mere presumptions and implications, properly arising in the absence of any positive expressions of intention, to control, vary, or contradict tbe most formal and deliberate written declarations of the parties.” These views, in addition to the high source whence they came, commend themselves to our judgment by their intrinsic soundness. “ Not only is a custom inadmissible which the parties have expressly excluded, but it is equally so if the parties have excluded it by necessary implication. For a custom can no more be set up against the clear intention of the parties, than against their express agreement, and no usage can be incorporated into a contract which is inconsistent with the terms of the contract.”*
Tested’ by these principles the usage attempted to be set up in the case at bar cannot be sustained. It contradicts directly the written contract. It proposes to set aside all that is said about the rate of premium, and substitute the discretion of one of the parties to the instrument. It goes upon the assumption that all that is written in the contract, which fixes, or ascertains, or limits the amount that may be claimed for premium of insurance by the company, is nugatory, and that the whole field is left open, and the power placed in the hands of one of the parties exclusively. No such usage can be admitted thus to contradict, vary, and control this contract. •
The court below was right in refusing the prayers of the defendants which we have been considering, and in submitting as the only question for the jury to determine, the rating of the vessel in reference to A 2.
. Upon this question the defendants below, in some five or six forms, prayed that the jury be instructed that it must be determined by the rating of the vessel on the books of the defendants, and other, insurance companies in New York. The court refused the prayers, but told the jury, that “ if *472 they should find that the rating of vessels on the registers of the companies in New York was always from personal examination by inspectors of the different companies, and should further.find that by the long absence of the said vessel from New York, she had, in the understanding and usage of underwriters in New'York no fixed rating on the registers of any of the insurance companies in that city in 1856,” (the date of the contract), “but would have been rated there not lower than A 2, owing to her thorough repair, had she been there for examination, then the plaintiff is entitled to recover, although the jury may find that the said vessel was rated in 1848 and 1849 on the books of defendant, below A 2; .and that it was the general usage and understanding of underwriters and commercial men in New York, that the words in their policies, ‘ not rating below A 2/ refer to the rate of vessels on the register of the company making the insurance.”
It is claimed by the plaintiffs in error, ‘that the proposition submitted to the jury as to the rating of the vessel, must be determined exclusively by a reference to the books of the company making the policy. Although no such instruction was asked in the court below, it is urged upon this court that such is the true construction of the contract, and that the charge of the court was in conflict with this position.
There is nothing in the language of the policy itself to indicate the source to which we are to look for the determination of the rating of the vessel. The reasonable inference would seem to be, that, like any other question of value, or quantity, or quality, left open in a written contract, it should be decided by a reference to all the sources of information which enable the jury to fix the rate correctly.' What is meant by the rating of vessels in insurance policies? It means the determination of their relative state or condition in regard to their insurable qualities. It is a matter which has excited much interest in the commercial world, although we are not aware that it has been often before the courts. In G-reat Britain there was established, in the year 1834, a department at the British Lloyds devoted to this very business. They *473 have their inspectors in all the ports of the three kingdoms, whose reports are forwarded to a board at London, and this board fixes the rate of all vessels which are known to it, and whose owners are willing to have them examined. The • register thus kept, is the one used and referred to in all contracts of insurance in that country. They, however, have a mode of rating entirely different from any adopted here.* The testimony in this case shows that there is in New York an institution calling itself the American Lloyds, which is now attempting to establish the same position as the one referred to in England. But the proof is, that its rating is not generally adopted as yet, either by insurers or insured; and that each company in New York which does any considerable amount of business, has its own inspectors and its own register for rating vessels. The evidence shows that this rating differs very materially on the registers of the different companies. None of these registers have, or can have, any right to determine conclusively the rate of a vessel, when that question comes to be determined in a court of justice. It would seem that in a question of this kind, left open by one of these insurance companies, and the party whom it has professed to insure, equity would require the matter to be determined, if by the register of any company, by some other than that of the party interested. These registers are the private books of the companies. They are not for public use, and can only be seen by the courtesy of the companies’ officers. Under these circumstances the justice of the principle which would refer the rating of the vessel exclusively to this register of a party to the suit, when no such provision is inserted in the policy, is not perceived. If they make their contracts, intending to assert such a claim, fair dealing requires that they insert it in their policy.
But testimony was.introduced tending to show that, by the usage of underwriters and merchants in New York, the rating referred to was the rating on the register of the company which made the policy, and the court instructed the *474 jury to disregard this usage if they should find that there was no rating of this vessel on the books of one of the defendants, and none since 1849 on the books of the other company.
The testimony shows that the Mary W. left New York in 1849, and has never been there since, and that was the date of the last rating on the books of the “ Sun Mutual Insurance Company,” one of the defendants, and that the “ Orient Mutual,” the other defendant, came into existence in 1854, and the Mary W. never had a rating on its register.
It was also proved by several witnesses, and is uncontra dieted, that a rating seven years old is regarded by all insurance men as no rating at all. Here is a case, then, where a party is seeking to incorporate into his contract a usage, that the rating mentioned in his policy must have exclusive reference to his own register, when the vessel supposed to be insured is not on that register at any rating whatever. It must be remembered that we are now trying to arrive at the intent of the parties at the time the policy was made, and that this usage is introduced to assist us in that effort. Can it be believed that the contracting party, who paid his money at that time for insurance on coffee, to be shipped on any vessel that was seaworthy, whether below A 2 or above it, whether foreign or domestic, had any idea that he was limited in the selection of his vessel, to such as might be found on the register of the company he was dealing with ? Or that the company, which professed to insure the coffee on home vessels or foreign vessels, on vessels rating above or below A 2, on shipments to Atlantic ports or Gulf ports from Brazil,' intended to limit the plaintiff to the use of vessels whose names might be found on their register? And this, too, when one of the companies had no register reaching back more than two years. Yet we must believe this, if we hold the usage mentioned in the instrument as controlling the case.
It is not, however, necessary to go any further in this case than to decide, as we do, that such usage, if it were admissible- at all, could only apply to the case of a vessel which *475 had an actual rating on the hooks of the company so recent as to be recognized by insurers as a valid rating. And that as the Mary W. had no such rating on the books of the defendants, the usage cannot apply to these contracts. Such was evidently the view of the court below, in which we think it was correct.
But the court was asked by the defendants below to instruct the jury, that in determining the rate of the Mary W., they must confine themselves to the registers of the defendant and the other insurance companies of New York.
The vessel had no rating on the books of any insurance company in New York, later than 1849, which was more than seven years before the risk was claimed to attach in these cases. It was, as we have already said, fully proved that such a rating was wholly disregarded by all insurance companies, as being of no value. The effect of the instruction would have been, to confine the jury to testimony which would give them no light on the subject they were directed to consider; indeed, to that which could not be called evidence at all. And the argument that plaintiff could not be supposed to have contracted with reference to any such rule as this, is quite as forcible as it is in regard to the claim to confine the evidence to defendants’ own books. In this instance, there is no claim that the rule is supported by any usage. These registers differ among themselves, and those offered in evidence show that at the time the Mary W. left the Atlantic coast for California, in 1849, she had as many as three different ratings on the books of the five companies whose registers were offered in evidence. Which of these should prevail, even if they were recent enough to be admissible ? Shall the jury be excluded from all other evidence to explain these differences, or to show the relative value or reliability of these different estimates ? Can any sound reason be given for such exclusion ? It is supposed that the few companies which may happen to have a vessel on their register have exhausted the means of information as to her character, and that no one else can throw any light on it? So far from restricting the jury in this manner, it seems to *476 us that as the true object of inquiry is to fix the insurable character or status of the vessel, they should be at liberty to hear any testimony which would tend to show her capacity for resisting the perils insured against. It is therefore our opinion, that when the court instructed the jury to base their verdict on the fact to be ascertained by them, whether the Mary W. would or would not have rated below A 2 in New York, had she been there for examination, the rule was stated quite as favorably to plaintiffs- in error as sound principle will justify.
It is objected that the testimony of certain persons in Rio, and especially the agreed statement that she was entitled to rate as high as A 2, at that place, was not competent under the issue. We think this fact might well be submitted to the jury with many others, none of which were conclusive, but all bearing on the question before them. The fact that she had been newly and thoroughly repaired, had been surveyed before and-after the repairs, and the results of these' surveys, the results also of examinations made by seamen tong engaged in the trade between Rio and the United States, were the best, perhaps the only evidence, of her then condition and insurable status. When the court, in addition to these facts, admitted on the part of plaintiffs in error, the opinion of New York experts on this testimony to go with it, and also the seven years’ old rating of the plaintiffs in error, and other insurance companies, we cannot but conclude that the case went fairly to the jury on the testimony. None of it was held conclusive. No instruction was asked of the court or given as to its relative value, and as none of it was absolutely irrelevant, we see no error in its admission to the prejudice of the plaintiffs in error.
We have thus examined in detail, and with much caution, the points raised against the verdict below, and, as we find none of them, tenable, the judgments are
Affirmed.
Mr. Justice NELSON:
The policy in this case underwent a very full examination *477 when it was formerly before the court. * The evidence in that case showed, and the argument of the counsel proceeded upon the assumption, that the vessel rated in New York, the place of the contract, below A 2; and, inasmuch as the policy provided, in case of that rating, for an additional premium, the principal question was, whether or not the company had a right to fix the additional premium, or, in case of dissent by the insured, it was a question to be determined by the court and jury. This coui’t held, upon a true construction of the policy, that the right belonged to the company. The judgment of the court below was reversed, and the cause remanded for a new trial. On this second trial, which is now before us for review, the plaintiff placed his' right to recover upon the ground that, at the time the Mary W. was reported to'.the company for indorsement on the policy, she, in point of fact, rated A 2, and hence came within the description of vessels in the policy that were to be insured for the premium paid when it was issued, which was 1J per cent. This ground was denied by the company, and, in addition, they also maintained that even if, as claimed, the vessel rated A 2 at the time of the report for indorsement, they had a right to add to the premium of the one and one-half per cent.; and inasmuch as the plaintiff had refused to pay this additional sum, no insurance of the coffee was effected. This latter position of the company assumed that, upon the true construction of this running policy, no binding contract of insurance existed in respect to a vessel reported for indorsement, whether she rated A 2 or not, until the company had fixed the rate of premium, and the insured had assented to it; and further, that whether the vessel rated A 2 or above that rate, they had a right to demand an additional premium to that mentioned in the policy.
We will reverse the order of the questions as stated, and inquire, first, whether or not the company are bound by the terms and conditions of the policy to insure a vessel for the *478 premium mentioned on the report of her for indorsement, if at the time she rates at or above A 2?
The' article insured, as specified in the policy, is coffee, to be shipped from Rio de Janeiro to a port or ports in the United States, the company to add an additional premium if by vessels lower than A 2, or by foreign vessels; per cent, to be returned if shipped direct to an Atlantic port. The premium paid as the consideration for the insurance, as recited in the policy, is at and after the rate of one and one-half per cent.
If there were no other provisions in this policy relating to the premium than those above stated, it would seem to be plain the coffee shipped in a vessel rating A 2, or above, would come within the description required by its terms as a condition of its binding effect, for the right of the company to add an additional premium is limited to the case of a vessel rating below A 2. If A 2, or above, no addition is to be made, and, if not, the moment the vessel is reported for indorsement the contract is complete. The whole of the premium that could be demanded had been already received by the company.
But there is another clause in this policy, which it is supposed qualifies the above construction, and which is as follows : “ The premiums on risks to be fixed at the time of indorsement.” The company rely upon this clause as securing to them the right in all cases to fix the premium at the time the risk is reported; and consequently, unless that rate is assented to by the insured, there is an end to the incipient contract, and, as we have already said, the company claims also under this clause to add to the premium in the policy even if the vessel rates A 2, or above, even if she should rate A 1.
In order to understand the force and effect of this clause, it will be useful to refer, for a moment, to the usage of the company in taking these risks on their running policies, as proved in this case. The premiums specified in the body of the policies are regarded as nominal, or rather as average premiums, and the true premiums to be charged are fixed *479 hj increasing or reducing the average premiums when the risk is reported. This usage explains what is meant by the clause, “ The premiums on risks to be fixed at the time of the indorsement,” — for, by recurring to the terms of the policy, it will be seen they provide for the case when an addition to the premium may be made, namely, when the vessel rates below A 2; and also, when the reduction is to be made, namely, in case the vessel rates A 2, or above, and the shipment of the coffee is to an Atlantic port, the reduction then is to be J per cent.. This usage has been carried out, practically, during the running of this policy. The following vessels are indorsed on it: “ August 13, 1855, Bark Maine Law, from Bio de Janeiro to New Orleans, $15,750 at 1J per cent.; Brig Windward, from same place to Baltimore, $4750 at 1J per cent. Nov. 20, Brig T. Walters, from same place to Philadelphia, $2375 at 1£ per cent.” This usage and the practice under it, furnishes a full explanation of the clause in question, and reconciles it with the previous parts of the policy, which were supposed to be in contradiction to it. It is true, the premiums are to be fixed at the time the risks are reported, but they are to be fixed in accordance with the stipulations in the policy, which, as we have seen, have specially provided for them. The company can make no additions to the premium except the vessel rates below A 2. If at or above this rate they are bound to deduct the J per cent., when the risks are reported, if' shipment be to an Atlantic port.
As to the other provision relied on, namely, “ And such clauses to apply as the company may insert as the risks are successively reported.” I agree that they have no reference to the questions involved in this case, and may be left for construction when a case arises under them.
The next point in the case, and the only difficult one in my judgment, arises out of the position taken by the plaintiff in the court below, that the vessel Mary W., in point of fact, rated as high as A 2 at the time she was reported to the company.
We lay out of view all questions, so fully discussed on the *480 argument, whether or not the rating of vessels referred to in the policy, related to the rating'in the books of the company, or, if not, to the books of other companies in the city of New York; and whether resort must be had exclusively to these books for the purpose of ascertaining the rating of the vessels; for it appears from the evidence, and is not to be denied, that neither the books of the Orient, or of the Sun company, nor of any other of the insui’ance companies in the city, contained in contemplation of law a rating of the Mary W., at the time she was reported to the two companies, that could be of any controlling weight on the question. She was not rated in the books of the Orient at all, and had not been in those of the Sun for some seven years; and the same is true in respect to the other companies. There is not evidence in the case, therefore, to raise the questions as to the effect to be given to the rating of a vessel in the books of the company at the time of the insurance; and hence, it would be premature to express any opinion upon them, or upon the effect to be given to the like evidence in respect to the books of other companies at the place of the contract. These are important and. interesting questions, and may well deserve the deliberate and careful consideration of the court when properly presented for decision.
The evidence, with a view to. ascertain the rate of the Mary W. at the time she was reported for indorsement on the policy, 23d August, 1856, must of necessity be derived as well from other sources as from the books of insurance companies; and the questions are, in this posture and condition of the cáse, whether the court below admitted improper evidence against the objections of the defendants, and whether the charge of the court in submitting the case to the jury is subject-to any of the exceptions taken to it.
As we have seen, there being no evidence in the record of this rating of the vessel on the books of the Orient.company at all, nor upon those of the Sun at the time she was reported, within the period of some seven years, after the lapse of which time the rating bound neither the company nor the insured, the question whether the Alary W. rated at *481 tlie time reported not lower than A 2, of necessity depended upon general evidence of the character and condition of the vessel, and could not be restrained to the rating in the books; so in respect to the other insurance companies in the city of New York, as the rating in these hooks was made also some seven years prior to this insurance transaction. And, as it respects this general evidence, the appellate court can only look at such parts of it as were objected to and exceptions taken at the time offered at the trial.
The only exception we find taken is in respect to the competency of the testimony on a commission to Rio de Janeiro, or rather to the admission of evidence as the substitute for the commission, and which is, that the Mary W., at the time she left Rio on the voyage in which she was lost, was in a seaworthy condition, fit for any voyage, and especially for the transportation of coffee; and was, by reason of thorough repairs at Rio, entitled to rate, and did rate A 2 there. We agree that the rating of the vessel at Rio was not the criterion to determine the question before the court and jury. But it was competent testimony, tending to prove the quality and condition of the vessel at the time of her report to the company. The proof of the rating of a vessel consists, not only of testimony as to her construction, materials, age, &c., hut also, of the opinion of experts, such as ship-builders and ship-masters, and others familiar with the subject. The record in this case is full of examples of this description of evidence, and the opinion of the witnesses as to the rating of a vessel is but the expression of the result of their examination of her. The rating by official inspectors, with a view to an entry in the hooks of a company, is evidence of the same character.
Then, as to the charge of the court. It is certainly very comprehensive and involved, and must have been difficult for a jury to understand; but we will endeavor to state the substance of it, which is this: that if the juiy should be of opinion from the evidence, that the Mary W. at the time she left Rio was seaworthy and in good condition, and after her repairs was specially fit for the transportation of coffee, and *482 rated there A 2; and shall further find, that by the long absence of said vessel from the city of New York, there was no fixed rating on the registers of any of the insurance companies in that city in 1856; but that she would have been rated there not lower than A 2, owing to her thorough re-' pairs, had she been there at the time, then the plaintiff was entitled to recover, notwithstanding she rated in the city of New York in 1848-9 on the books of defendants below A 2; and notwithstanding it was the usage and understanding of underwriters and commercial men in that city, that the phrase “ not below A 2,” referred to the rate of vessels on the hooks of the company making the insurance.
If this charge is examined with reference to the evidence in the case, we think it is unexceptionable. It must be remembered that there is no testimony found in the record of a rating in the books of the companies, defendants, or in other insurance companies in the city of New York, that could, in any aspect of the case, be controlling. It was necessary, therefore, to.go outside of these companies, and resort to general evidence of the character and condition of the vessel, in order to find her rate at the time of the report for indorsement; and in this view of the case, and which we think the true one, the court instructed the jury, if upon this evidence they find that the Mary W. would have rated in the city of New York at the time of the-report, the plaintiff was entitled to recover, otherwise not. We do not see how the cáse could,' consistently with the evidence, have been put to the jury more favorably, to the defendants. If these companies will undertake to insure vessels according to their rate, when no fixed rate is found in their books at the time, and no fixed standard exists, such as the British Lloyds, in England, by which to ascertain the rate, resort must necessarily be had to general evidence of the character and condition of them at the time of the insurance, with a view to the rate that would be assigned to her in the city of New York, the place of the contract.
Eor the reasons above given we think the judgment of the court below right, and should be affirmed.
*483 Mr. Justice FIELD concurred in the opinion of Mr. Justice NELSON.

 Op Evidence, vol. 2, £ 251

 Id., I 292.

 2 Sumner, 567.

 2 Parsons on Contracts, 59; Blivin et al. v. The N. E. Screw Co., 23 Howard, 431; Atkins v. Howe, 18 Pickering, 16; Bogert v. Cauman, Anthon N. Y. R., 70; Allegre v. The M. Ins. Co., 2 Gill & Johnson, 136.

 Seo McCullocli’s Commercial Dictionary, p. 1169.

 Vide Report, 23 Howard, 401, 412.